UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

A.D. SWAINGAN                              CIVIL ACTION

VERSUS                                     NUMBER: 10-1118

MICHAEL J. ASTRUE,                         SECTION: "C"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB"). (Rec. docs. 9, 10).  Also before the Court is plaintiff's motion to admit additional evidence and the Commissioner's opposition thereto. (Rec. docs. 11, 12).

A.D. Swaingan, plaintiff herein, protectively filed the subject application for DIB on June 6, 2007, alleging disability as

of October 1, 2001. (Tr. pp. 17, 49, 94).[1]/ On that same date, plaintiff also filed an application for Supplementary Security Income under Title XVI, which was approved by the agency. In connection with that latter application, plaintiff was found disabled effective June 6, 2007. He did not appeal that finding. (Tr. p. 17). The only issue, therefore, before the Court is the denial of disability insurance benefits based upon the determination that plaintiff's disability did not occur until his insured status had expired.

In an undated Disability Report that appears in the record, the condition resulting in plaintiff's inability to work was identified as a heart condition causing shortness of breath, chest pain, and difficulty in moving. (Tr. pp. 80-86). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on November 16, 2007. (Tr. pp. 31-34). Pursuant to plaintiff's request, a hearing de novo before an  Administrative Law Judge ("ALJ") went forward on December 8, 2008 at which plaintiff, who was represented by counsel, and a  Vocational Expert ("VE") appeared and testified. (Tr. pp. 25, 231-261). On May 18, 2009, the ALJ issued a written decision in which she concluded that plaintiff was not disabled

---

[1]/ The actual application for DIB is not included within the record of the administrative proceedings that were conducted below.

within the meaning of the Social Security Act prior to the expiration of his insured status on June 30, 2006. (Tr. p. 14-24). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 6-8). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1)   the plaintiff's conditions were severe;

2)   the Judge applied the wrong FCA to the Grid; and,

3)   Mr. Swaingan meets Listing 12.05(C) and this case should be remanded to develop more evidence on this point.

(Rec. doc. 9-1, pp. 2, 3, 6).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.   [t]he claimant last met the insured status requirements of the Social Security Act on June 30, 2006.

2.   [t]he claimant did not engage in substantial gainful activity during the period from his amended alleged onset date of August 30, 2005, through his date last insured; June 30, 2006 (20 CFR 404.1571 et seq.).

3.   [f]rom the amended alleged onset date of August 30, 2006, through the date last insured, there is insufficient evidence to show that the claimant had an impairment or combination of impairments that significantly limited his ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have

3

    a severe impairment or combination of impairments within
the meaning of <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir.
1985) and the Regulations.  (20 CFR 404.1521, <u>et</u> <u>seq</u>.).

4.    [i]n the alternative, from the amended alleged onset date
of August 30, 2005, through the date last insured, the
claimant had tobacco abuse, crack cocaine abuse, chronic
obstructive lung disease, and, atherosclerotic heart
disease, severe impairments within the meaning of <u>Stone
v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985) and the
Regulations.  (20 CFR 404.1521 <u>et</u> <u>seq</u>.).

5.    [t]he claimant has a marginal education.

6.    [b]orn on July 11, 1951, the claimant was closely
approaching advanced age on the alleged onset date of
August 30, 2005 and was of advanced age for
administrative purposes on the date last insured, June
30, 2006.

7.    [t]he claimant was unable to perform his past relevant
work.

8.    [t]he claimant is not disabled under Medical Vocational
rule 203.11.

9.    [t]he claimant was not under a disability, as defined in
the Social Security Act, at any time from August 30,
2005, the amended alleged onset date, through from June
30, 2006, the date last insured. (20 CFR 404.1520(c)).

                               (Tr. pp. 19, 20, 23, 24).


    Judicial review of the Commissioner's decision to deny DIB is
limited under 42 U.S.C. §405(g) to two inquiries: (1) whether
substantial evidence of record supports the Commissioner's
decision, and (2) whether the decision comports with relevant legal
standards. <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992);
<u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v.</u>

Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

    A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§423(d)(1)(A).

Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the 5-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

> 1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2. an individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.
>
> 4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.
>
> 5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first 4 steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the claimant carries that burden and

6

successfully demonstrates that he is unable to perform the work that he has done in the past, the burden of proof shifts to the Commissioner at the fifth step to show that the claimant can perform other work in light of his age, education, work experience, and physical and mental limitations. Kramer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).  In determining whether there is other work available that the claimant can perform, the Commissioner may rely exclusively on the Medical-Vocational Guidelines of the Regulations when the claimant suffers only from exertional impairments or when his non-exertional impairments do not significantly affect his residual functional capacity. Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Fraga, 810 F.2d at 1304.  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

      At the outset of the administrative hearing that was held on December 8, 2008, plaintiff's counsel pointed out that the record was not yet complete as it lacked documentation that was generated during a several-day hospital admission the previous month despite those records having been requested.  When asked how important those records were counsel argued that they tended to demonstrate that plaintiff suffered from attacks of chronic obstructive

pulmonary disease that were sufficiently severe to require hospitalization. That condition, when considered along with plaintiff's age, education, work experience, and his history of cardiac disease requiring the placement of stents in 2001 essentially rendered him disabled. Those arguments notwithstanding, the ALJ pointed to EKG results that were essentially negative, a history of hypertension that was controlled with medication, and a reported history of angioplasty but with no records from that procedure. The documentary evidence that existed was then admitted into evidence. (Tr. pp. 233-236).

Plaintiff was then sworn in and was questioned by the ALJ, first being asked about his cocaine use that was repeatedly reflected throughout the medical records. Plaintiff had not gone to any treatment program but was no longer using the drug and his attorney had 2 witnesses who were available to testify that there had been no drug use following Hurricane Katrina. When asked why he believed himself to be disabled, plaintiff testified to experiencing breathing difficulties which caused him to get out-of-wind when engaging in activities like using the lawnmower as well as hot flashes. Lifting caused occasional problems to plaintiff's lower back and knee and in reviewing the file the ALJ realized that plaintiff's insured status and entitlement to DIB has expired in 2006. Plaintiff testified that he had last worked as a

8

construction worker in 1999 when he got laid off and began receiving unemployment benefits. His health subsequently deteriorated, some of which was possibly related to his cocaine use. Respiratory problems were plaintiff's main concern for which he was then being seen every 3 to 4 weeks. While waiting to see the doctor the previous month, plaintiff "almost fell out" and had to be hospitalized. Only recently had he been placed on a proper, effective medication regimen. If he was successful in obtaining DIB, plaintiff intended to obtain his own residence and to spend more time with his grandchildren. (Tr. pp. 237-245).

Upon being tendered to his attorney for further questioning plaintiff testified that although he had stopped "a while back", he had been a heavy smoker since the age of 22. In terms of physical capabilities, plaintiff estimated that he could walk for 1.5 to 2 blocks before becoming short of breath and needing to rest. He lived with his sister at the time. Other activities included raking leaves with resulting shortness of breath after 45 to 60 minutes and weeding the garden. Medications at the time included Prednisone and an Advair inhaler. Contradicting his earlier testimony, plaintiff testified that he had worked until some time in 2001. Academically, he had only gone as far as the third or fourth grade and was unable to read or write. The construction work that he had once done could no longer be performed. (Tr. pp.

9

245-251).

John Yent, a VE, was next to take the stand. After obtaining some clarification from plaintiff as to the duties that he had performed in the construction work, Yent proceeded to classify the exertional and skill demands of plaintiff's past relevant work, as follows: concrete/paving laborer - very heavy, unskilled; carpentry helper-heavy, semi-skilled; iron worker helper-heavy, unskilled; and, construction laborer - very heavy, unskilled. The ALJ then posed a hypothetical question to the VE which assumed an individual who had the residual functional capacity ("RFC") that had been assessed by Dr. Anthony Scardino, an Administration Medical Consultant, on September 10, 2007. In answer thereto, the VE testified that an individual who had those limitations would be unable to perform plaintiff's past work. Although a number of medium-level construction jobs did exist, the environmental limitations that had been noted by the doctor would have precluded the performance of that work. (Tr. pp. 251-254).

During the course of the hearing, plaintiff acknowledged that he was already receiving Supplemental Security Income ("SSI") benefits. After discussions between the ALJ and plaintiff's counsel, the alleged onset date was amended to August 30, 2005 with the ALJ remarking that the evidence that had been produced thus far was insufficient to establish disability prior to the expiration of

plaintiff's insured status in June of 2006.  To the hypothetical question as initially framed by the ALJ she added that the individual had only a marginal education or was illiterate.  In answer to the hypothetical question as so amended, the VE testified that a specific rule in the Medical-Vocational Guidelines may apply which the ALJ admitted while continuing to question the sufficiency of the evidence that had been generated prior to the expiration of plaintiff's insured status.  At the close of the hearing, plaintiff's attorney pointed out that a second RFC assessment had been conducted which demonstrated that plaintiff was only capable of sedentary-level work. (Tr. pp. 254-261).

Before discussing the documentary evidence that was admitted in the proceedings below, the Court pauses to emphasize the brief time period that is at issue in this litigation.  As noted above, plaintiff alleges disability as of August 30, 2005, the day following the landfall of Hurricane Katrina, with the significance of that date apparently being the alleged discontinuation of his use of crack cocaine.  As was also noted above, plaintiff's disability insured status and consequent entitlement to DIB expired approximately 10 months later on June 30, 2006.  As noted by the Fifth Circuit, "[a] claimant is eligible for benefits only if the onset of the qualifying impairment [or combination of impairments] began on or before the date the claimant was last insured." Loza

v. Apfel, 219 F.3d 378, 394 (5th Cir. 2000)(bracketed material in original).  "Claimants bear the burden of establishing a disabling condition before the expiration of their insured status." Ivy v. Sullivan, 893 F.2d 1045, 1048 (5th Cir. 1990)(citing Milan v. Bowen, 782 F.2d 1284 (5th Cir. 1986).  An impairment which had its onset or became disabling after a claimant's insured status had expired cannot serve as a basis for a finding of disability.  Owens v. Heckler, 770 F.2d 1276, 1280.  (5th Cir. 1985). "Factors relevant to the determination of the date of disability include the individual's declaration of the date of when the disability began, work history and available medical history." Loza, 219 F.3d at 394.  "The claimant's stated onset date of disability is to be used as the established date when it is consistent with available medical evidence and may be rejected only if reasons are articulated and the reasons given are supported by substantial evidence." Id. See also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).

    The documentary evidence of record begins with records from the Medical Center of Louisiana at New Orleans ("MCLNO") where plaintiff presented to the Emergency Room ("ER") on December 17, 2001 with complaints of chest pain to the left substernal area radiating to the left arm and jaw.  The hospital paperwork indicates that plaintiff was then working as a laborer for Minute

Men of Louisiana, Inc.  Upon being seen at the ER that Monday afternoon, plaintiff advised hospital personnel that he had experienced a 2.5-hour period of chest pain the previous Friday as well as several episodes on Saturday while he was at work but none on Sunday.  While at work again on Monday, plaintiff began experiencing off-and-on chest pain with associated shortness of breath, diaphoresis, nausea, and vomiting. Plaintiff's chest pain was relieved after several hours of treatment in the ER.  Various tests were run, including an EKG and echocardiagram, and plaintiff tested positive for cocaine use upon being admitted for acute coronary syndrome.  It was also noted that plaintiff had a history of hypertension and had smoked 1 to 1.5 packs of cigarettes per day for the previous 30 years.  He had never had a cardiac work-up.

The day following his acute myocardial infarction and hospital admission plaintiff was taken to the cardiac catheterization laboratory where the following procedures were performed: a left heart catheterization, a left ventriculography, a coronary angiography, angioplasty and stent placement in the mid-right coronary artery, and an angio-jet of the right coronary artery. The procedures were successfully completed and plaintiff's subsequent hospital course was uneventful and stable.  Plaintiff was discharged home ambulatory and in stable condition on December 20, 2001 with a diagnosis of coronary artery disease, status post

13

inferior myocardial infarction, status post stent of the right coronary artery, dyslipidemia, and substance abuse. He was to follow-up with the Cardiology and Medicine Clinics, was to go on a low-salt/low-cholesterol diet, and was prescribed aspirin, Captopril, Zocor, Plavix, nitroglycerin as needed for chest pain, a daily multivitamin, thiamine, and folate. Plaintiff was also advised to discontinue cocaine and cigarette use. (Tr. pp. 112-143).

Plaintiff was next seen at the MCLNO Outpatient Department on January 15, 2002 for monitoring of his cardiac condition. He had no chest pain, shortness of breath, dyspnea on exertion, palpitations, or syncope. Blood pressure was measured at 100/50. The impression included status post stent placement with plaintiff being described as doing well and asymptomatic. Plaintiff was to return for further follow-up in 3 months. (Tr. p. 144). On March 11, 2002, plaintiff was seen at the MCLNO Medicine Clinic where he was said to still be free from chest pain, shortness of breath, or dyspnea on exertion. Plaintiff was to continue on the Captopril, Zocor, and aspirin regimen, was encouraged to diet and exercise, and was to return to the Clinic in 4 months. (Tr. p. 111). Routine bloodwork was done in early August of 2002. (Tr. pp. 109-110).

Plaintiff was said to be doing well when he returned to the Medicine Clinic on September 23, 2002. The dosage of Captopril was

to be increased to better control his hypertension and the Zocor and aspirin were continued.  A colonoscopy was to be scheduled as a preventive measure and plaintiff was to return in 3 to 4 months. (Tr. p. 108).  The next medical records were not generated until August 6, 2003 when plaintiff was seen at the MCLNO ER for complaints of pain in the left ear, a sore throat, difficulty in swallowing, and fever for the previous 5 days.  He also complained of sneezing and he had vomited once that day.  The diagnosis was tonsillitis and plaintiff was administered antibiotics and was prescribed additional antibiotics and pain medication. (Tr. pp. 102-103). Plaintiff returned to the MCLNO ER on August 11, 2003 to obtain the results of a throat culture that had been taken on his previous visit.  By that date, plaintiff was feeling better with no fever or a sore throat.  The assessment was strep throat which had been successfully treated. (Tr. pp. 100-101).  On both of these August 2003 ER visits, hospital records still identified plaintiff's employer as Minute Men of Louisiana, Inc. (Id.).

As far as the record reflects, plaintiff received no further medical treatment until over 3 years and 9 months later when he returned to the MCLNO ER on May 21, 2007, almost 11 months after his disability insured status had expired.  The presenting complaint was shortness of breath for the previous 1 to 2 years with dyspnea upon exertion after walking 2 blocks or climbing 1

15

flight of stairs.  Plaintiff denied orthopnea, lower extremity edema, chest pain, nausea and vomiting, and diaphoresis.  He advised the attending hospital personnel that he had properly taken his prescribed medications prior to 2005 which were effective but that he had not taken his medications for 2 years.  Plaintiff was still smoking cigarettes at the time and he had last used cocaine earlier that week.  Chest x-rays revealed a small  relatively symmetric apical pleural thickening but the cardiac silhouette was within normal size limits. The diagnosis was an exacerbation of congestive heart failure and cocaine abuse and plaintiff was admitted to the hospital in good condition. (Tr. pp. 216-221, 224-225, 200).

During his inpatient stay, plaintiff underwent pulmonary function studies. (Tr. pp. 196-199).  Coronary angiography was performed on May 25, 2007 which revealed evidence of coronary artery disease with there being a 75% mid lesion to the left anterior descending artery, a 25% narrowing of the left circumflex, 100% occlusion to the right coronary artery, and 100% in-stent restenosis of the right coronary artery stent.  Percutaneous coronary intervention to the left anterior descending artery was recommended as was the discontinuation of cocaine use along with secondary prevention. (Tr. pp. 222-223). Given the location of the lesions, further stenting was ruled out and plaintiff was

16

ultimately discharged on May 26, 2007 with an outpatient dobutamine stress echocardiogram to be performed to determine whether a coronary bypass was warranted. Based on the information that had been compiled during his hospital stay and plaintiff's history of smoking, the possibility of a diagnosis of chronic obstructive pulmonary disease ("COPD") was raised. Ideally, plaintiff should have been on Advair and Spiriva but concerns were raised over whether he could afford the drugs. The discharge diagnosis was coronary artery disease, positive cocaine use, and COPD. Various medications were prescribed and plaintiff was to resume physical activities as tolerated. (Tr. pp. 212-215, 187-189).

Plaintiff was next seen at MCLNO in the latter part of May of 2007 for pre-stress test clearance which was then scheduled for June 5, 2007. (Tr. pp. 207, 210-211). While some of the medical records indicate that the test had to be cancelled due to the presence of a non-obstructive lesion, the record also contains a dobutamine stress echocardiogram report which indicates that the test was performed on June 5, 2007 and was only stopped when the target heart rate was achieved. (Tr. pp. 206-207, 209, 205). The test was interpreted as being negative for new ischemia but demonstrating myocardial contractile reserve with low dose viability. (Tr. p. 205).

Also included within the administrative record is a "Function

Report-Adult" form that elicited information about plaintiff's daily activities.  There plaintiff indicated that he rose in the morning but had to remain in a prone position until he could catch his breath.  He would then drink coffee, wash clothes, and clean up his bedroom followed by watching TV and taking naps.  Medication was taken at the designated times throughout the day.  However, all of the activities that he undertook had to be performed at a slow pace due to shortness of breath. Plaintiff typically slept on his back to help him breathe better.  He could tend to his own personal hygiene needs, could prepare his own meals daily, and could weekly clean, wash, iron, and rake leaves.  Plaintiff could use public transportation by himself, could shop for groceries, personal items and medication, and could count change, handle a savings account, and use a checkbook/money orders although he could not pay bills. Hobbies included watching TV, playing cards, and listening to music.  Twice per week plaintiff visited and went walking with others and 3 times per week he took a morning walk. However, almost all activities were effected by his condition with lifting being limited to 5 pounds, standing to about 5 minutes, walking to 2 to 3 blocks before needing to rest, and stair climbing to about 3 seconds.  Plaintiff could follow spoken instructions well, get along with authority figures, and could handle changes in routine. (Tr. pp. 71-79).

On August 23, 2007, plaintiff was consultatively evaluated by Dr. Miljana Mandich of Internal Medicine Associates of New Orleans, LLC.  Major complaints were identified as heart problems, high blood pressure, and "asthma". Although he came across as somewhat of a poor historian, plaintiff advised the doctor of his cardiac-related admission to MCLNO years earlier and stated that he had no chest pain after that time but was having progressively worsening shortness of breath and "some middle pains" in the chest in June of that year.  Plaintiff also advised Dr. Mandich of his inpatient stay in May of 2007 and of his long history of crack cocaine use, reporting that he had quit about a year earlier.  He was still smoking cigarettes at the time.  Blood pressure medication was taken only sporadically.  Medications at the time included Lisnopril, Metoprolol, Pravastatin, Advair, and Spiriva. Plaintiff experienced a frequent dry cough, shortness of breath upon walking 1 to 2 blocks, and could sometimes hear himself wheezing but he had not had any significant chest pains since the early 2000's.  Lately he had been suffering from off-and-on pain in the right side of the lower back that was made worse with prolonged sitting.

Upon physical examination, plaintiff was observed to ambulate without difficulty.  There was somewhat decreased respiratory expansion and distant breath sounds bilaterally.  There was also some faint peripheral wheezing with deep inspiration and forced

expiration but that completely cleared after plaintiff coughed a couple of times. Examination of the spine demonstrated full range of motion without any complaints. The borders of cardiac dullness were within normal limits; first and second heart sounds were normal with no third or fourth heart sounds being present; and there were no murmurs, shocks, thrills, gallops, or clicks. Neurologically, muscle bulk, tone, and strength were preserved in all extremities; sensation was intact; and there were no abnormalities of coordination, involuntary movements, reflexes, or disturbances of gait. From a mental status standpoint, plaintiff's personality estimate was normal but he was a poor historian and illiterate.

As part of the evaluation process, chest x-rays were taken which were interpreted as demonstrating COPD and over-exposed lung fields requiring re-examination. EKG studies showed a regular sinus rhythm with a rate of about 70 beats per minute with right axis deviation, left atrial enlargement, left ventricular hypertrophy, 1 PVC, and negative T-waves in the inferior leads. Based on the results of the evaluation, Dr. Mandich made the following diagnoses: 1) COPD; 2) hypertension by history, well-controlled with medication; 3) history of crack cocaine addiction until a year earlier; 4) chest pains, hospitalization and interventional procedures in the early 2000's; 5) allegations of

shortness of breath and another hospitalization earlier in the year without any significant chest pain; and, 6) illiteracy. (Tr. pp. 150-155, 145-149).

On September 10, 2007, Dr. Anthony Scardino, an Administration Medical Consultant, reviewed plaintiff's file as it was then extant and set forth his findings in a "Physical Residual Functional Capacity Assessment" ("FCA") form.  There, the doctor indicated that plaintiff could lift 50 pounds occasionally, 25 pounds frequently; could sit, stand, and/or walk for 6 hours per 8-hour workday; had an unlimited ability to push and/or pull; could occasionally climb a ramp/stairs and a ladder/rope/scaffolds but could frequently perform the other enumerated postural maneuvers; had no manipulative, visual, or communicative limitations; and, was to avoid concentrated exposure to extreme cold and heat. Essentially, plaintiff was found to be capable of performing medium-level work with his symptoms/limitations deemed to be only partially credible. (Tr. pp. 156-163).

On October 23, 2007, at the request of the State Disability Determination Services, plaintiff underwent complete spirometric testing at the direction of Dr. Gary Carroll, an associate of Dr. Mandich's. The studies, which were conducted before and after the administration of bronchodilators, produced findings compatible with severe obstructive disease that was improved by bronchodilator

21

therapy. (Tr. pp. 170-171, 164-169).  A copy of Dr. Carroll's report was subsequently provided to Dr. Scardino who, on November 8, 2007, completed a second FCA form in which he this time found that plaintiff was only capable of performing light-level work. (Tr. pp. 172-179).

The next medical records were not generated until September 19, 2008 when plaintiff presented to the MCLNO Medicine Clinic for follow-up of his hospitalization for coronary artery disease in May of 2007, citing sheer forgetfulness as the reason he had not scheduled an appointment sooner.  In the initial screening form, plaintiff was said to be complaining of pain to the head at a level of "5". Plaintiff reported being compliant with his blood pressure medications until a month earlier when he had run out.  The attending physician's note was negative for complaints of chest pain, nausea, vomiting, abdominal pain, headache, dizziness, or palpitations.  Plaintiff did complain, however, of shortness of breath that was relieved by Spiriva and Advair.  His blood pressure was measured at 160/100 but he had not taken any medication that morning.  Plaintiff reported a 3 to 4-year history of crack cocaine abuse but he had been clean for about a year. On physical examination, plaintiff had a regular heart rate and rhythm and no murmurs. His lungs were clear to auscultation bilaterally with no increased work on breathing and no wheezing.  The assessment was

hypertension which could be under better control, coronary artery disease, COPD, need for general health maintenance, and right knee pain.  In terms of the COPD, plaintiff was said to be doing well with his medications.  Refills were given on his various prescribed medications, a low sodium diet and regular exercise were recommended, and plaintiff was to return to the clinic at various intervals for further testing and monitoring of his condition. (Tr. pp. 190-194, 185-186).

Pursuant to the aforementioned recommendations, plaintiff underwent an eye examination at the MCLNO Ophthalmology Clinic on October 3, 2008.  The impression included hypertension but with no evidence of retinopathy. (Tr. pp. 201-204).  Plaintiff returned to the MCLNO Out-Patient Department to have his blood pressure checked on October 13, 2008.  It was measured at 139/97 and he was still smoking at the time.  Plaintiff was to return in 3 months and was to continue his low sodium diet and medications. (Tr. p. 183).  As noted earlier, the hearing before the ALJ would subsequently go forward on December 8, 2009 and the ALJ issued his unfavorable decision denying plaintiff's application for DIB on May 18, 2009. (Tr. pp. 231-261, 14-24).

The final piece of documentary evidence that was admitted in the administrative proceedings below is the report from a psychological evaluation that was performed by Dr. Scuddy

23

Fontenelle on June 15, 2009.  Plaintiff was then living with his daughter upon whom he reportedly relied for many needs on a daily basis, including driving him to the evaluation, paying the bills and managing money, and providing other forms of assistance. Plaintiff relayed his educational and work backgrounds and it was noted that he had been unable to work due to health issues including respiratory and cardiac conditions.  Medications included Spiriva, Advair, and Ventolin.   As part of the evaluation, plaintiff was administered the Weschler Adult Intelligence Scale: Revision III ("WAIS-III") in which he achieved a verbal IQ score of 65, a performance IQ score of 69, and a full scale IQ score of 64, placing him in the mild range of mental retardation.  In terms of educational levels of achievement plaintiff was felt to be functionally illiterate with social adaptive skills to be in the mild deficit range. The diagnostic impressions were as follows: Axis I-none; Axis II-mild mental retardation and a learning disorder, not otherwise specified (functional illiteracy); Axis III-Cardiac and respiratory conditions; Axis IV-moderate stressers; and, Axis V - a GAF of 40.  Dr. Fontenelle recommended that plaintiff receive continuing ongoing medical and healthcare treatment and that he remain compliant with this prescribed medications.  The doctor felt that plaintiff would have difficulty maintaining a routine concentration and attention span with respect

24

to vocational duties and that he would be unable to physically handle a typical 8-hour workday or a 40-hour work week. (Tr. pp. 227-230).

Plaintiff challenges the Commissioner's decision to deny him DIB on 3 grounds. In the first of those, plaintiff alleges that the ALJ erred in finding that he did not suffer from a severe impairment between the amended alleged onset date of August 30, 2005 and the date that he was last insured, June 30, 2006.

As defined by the Regulations, a "severe impairment" is any impairment or combination of impairments which significantly limits one's physical or mental ability to do basic work activities. 20 C.F.R. §404.1520(c); Shipley v. Sec. of Health and Human Services, 812 F.2d 934, 935 (5th Cir. 1987). Stated otherwise, an impairment can be considered as not severe only if it is a slight abnormality having such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of his age, education, or work experience. Anthony, 954 F.2d at 293; Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985); Estran v. Heckler, 745 F.2d 340, 341 (5th Cir. 1984).

In addressing this and plaintiff's other challenges, the Court first recalls that he originally sought DIB based on the existence of a heart condition and resulting symptomology, initially asserting a disability onset date of October 1, 2001. The

25

significance of that date is unknown and there were no medical records that were admitted below that were generated until over 2 months later on December 17, 2001.  At that time, plaintiff presented to the ER with complaints of chest pain over the previous several days.  Plaintiff underwent various cardiac procedures, including stent placement, and the discharge summary indicates that plaintiff had no medical or surgical histories and was on no medication prior to this admission.

Subsequent to this hospital admission, plaintiff was seen at MCLNO on 3 occasions, January 15, March 11, and September 23, 2002, for follow-up of his cardiac condition.  Plaintiff was characterized as doing well and asymptomatic on the first occasion and on the first 2 occasions he had no chest pain, shortness of breath, or dyspnea on exertion.  On the second occasion plaintiff was encouraged to diet and exercise.  Plaintiff was still doing well on September 23, 2002 and his medications were adjusted.  On none of the foregoing 3 occasions did plaintiff's doctors place any restrictions upon his activities.  See Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).  Subsequent to the latter date, plaintiff would be seen at MCLNO 2 additional times in the summer of 2003 for tonsillitis/strep throat, transient conditions that were unrelated to his cardiac difficulties.

It would not be until May 21, 2007, over 3 years and 9 months

26

later and nearly 11 months after his insured status had expired, before plaintiff received any additional medical care.  This lack of treatment over such a lengthy period was the primary reason that was cited by the ALJ in finding that plaintiff did not have a severe impairment during the relevant time period.  As there is no suggestion that plaintiff was prevented from obtaining any needed treatment for reasons beyond his control, the ALJ was not precluded from relying upon the lack of treatment as an indication of non-disability.  Villa, 895 F.2d at 1024.  The presenting complaint on May 21, 2007 was shortness of breath over the previous 1 to 2 years with dyspnea upon exertion after walking 2 blocks or climbing 1 flight of stairs but there was no orthopnea, lower extremity edema, chest pain, nausea, vomiting, or diaphoresis.  At that time, plaintiff admitted that he had not taken his prescribed medications since before 2005 and he continued to smoke cigarettes and to use crack cocaine.  The Regulations impose a duty upon claimants to follow the treatment prescribed by their physicians, 20 C.F.R. §404.1530, and an impairment that can reasonably be controlled with treatment or medication is not disabling.  Johnson, 864 F.2d at 348.

The Court also notes that the diagnosis in May of 2007 was an exacerbation of plaintiff's pre-existing heart condition which suggests that it was an acute onset of symptoms rather than

symptomology of a lengthy, ongoing nature.  Unlike <u>Ivy v. Sullivan</u>, 898 F.2d 1045 (5th Cir. 1990), the Court is not presented with a situation where a claimant's application for benefits was denied because he/she was unable to produce contemporaneous records of treatment that had undoubtedly been obtained as those records had been destroyed.  Rather, here there was a complete dearth of any medical evidence that was generated during the relevant time period coupled with a lack of any express retrospective medical opinion relating back to the insured period.  <u>See</u> <u>McLendon v. Barnhart</u>, 184 Fed.Appx. 430, 431-32 (5th Cir. 2006).  Plaintiff's hearing testimony focused almost entirely on his condition as it existed at that time. Although there is a lack of any medical treatment and the discontinuation of prescribed medications during the relevant time period along with plaintiff's continued abuse of crack cocaine,  the Court declines to rule on whether the ALJ was correct in her first finding that plaintiff was not disabled because he did not have a severe impairment. The ALJ made alternative findings which assumed that plaintiff did, in fact, have a severe impairment but nevertheless found him disabled on other grouds.

Plaintiff's second challenge to the Commissioner's decision is that the ALJ, in making her alternative finding at step 5 of the sequential analysis that plaintiff could perform other work, erroneously relied upon the FCA made by Dr. Scardino on September

10, 2007 rather than the second FCA he subsequently did on November 8, 2007. Plaintiff argues that the second FCA, made with the benefit of spirometric test results conducted at the behest of Dr. Carroll, was based on a greater body of evidence and provided a more complete picture of plaintiff's abilities.  Plaintiff also argues that reliance on the second FCA, wherein he was found to be capable of light rather than medium-level work, would have directed a conclusion of "disabled" under a different rule of the Medical-Vocational Guidelines.

In addressing plaintiff's second challenge, the Court recalls that the responsibility of weighing the evidence and determining the credibility of witness' testimony and doctors' opinions lies with the ALJ in the first instance.  <u>Carrier v. Sullivan</u>, 944 F.2d 243, 247 (5th Cir. 1991); <u>Griego v. Sullivan</u>, 940 F.2d 942, 945 (5th Cir. 1991); <u>Wren v. Sullivan</u>, 925 F.2d 123, 129 (5th Cir. 1991); <u>Moore v. Sullivan</u>, 919 F.2d 901, 905 (5th Cir. 1990).

In her written decision of May 18, 2009, the ALJ alternatively found that plaintiff suffered from various impairments, including chronic obstructive lung disease, that could be considered severe within the meaning of <u>Stone</u> and the applicable Regulations. (Tr. p. 23).  The ALJ went on to find, however, that the existence of such impairments did not preclude plaintiff from performing medium-level work during the period at issue.  In addressing the findings of Dr.

29

Scardino, the ALJ observed as follows:

> [t]he State agency physician assessed the claimant's
> residual functional capacity. The nonexamining medical
> expert determined that the claimant was capable of
> performing a wide range of medium work for the period
> ending with his date last insured (exhibit 4F). Based on
> the notes included in the assessment form, the assessment
> was based on records from 2001, 2002 and 2007 (exhibit
> 4F/8). The undersigned accords some weight to this
> opinion; however the limitations based on the
> consultative examination in August 2007 cannot be
> bootstrapped back to the earlier year when the claimant's
> insured status expired.
>
> The undersigned further notes that the claimant was
> actively smoking cigarettes and crack cocaine during the
> period at issue and they would be material factors in the
> claimant's COPD. Presumably, the claimant's lung
> functioning would have improved absent the substance
> abuse. However, without actual measurements of the
> claimant's lung functioning and documentation of the
> degree of substance abuse, there can be no accurate
> functional assessment of his lung functioning.
> Therefore, the undersigned concludes that the claimant
> could have reasonably been expected to perform the full
> range of medium work.

(Tr. p. 23).

Essentially, the ALJ found that the evidence of plaintiff's
COPD that was developed in 2007 did not relate back to the time
period when he was insured for DIB. A close examination of the
objective medical evidence supports that finding.

Prior to the amended onset date of August 30, 2005, the
complaints of shortness of breath that were voiced by plaintiff
were related to his cardiac difficulties. Those issues were
apparently resolved by the procedures plaintiff underwent in

December of 2001 as he had no shortness of breath at the 2 follow-up doctor's visits that he had subsequent to his discharge from the hospital.   Plaintiff's hypertension medication was adjusted on September 23, 2002 and he had 2 additional visits to the ER in August of 2003 for tonsillitis/strep throat.   Plaintiff received no further medical care until some 11 months after his insured status had expired.   During his hospital admission in May of 2007, plaintiff underwent pulmonary function studies in addition to other testing. For the first time, the possibility of COPD was raised. The discharge diagnosis that was given, in descending order of significance, was coronary artery disease, positive cocaine use, and COPD.

When he was consultatively evaluated by Dr. Mandich on August 22, 2007, plaintiff advised the doctor that his shortness of breath had only begun in June of that year.   X-rays confirmed the presence of COPD at this point in time and the first-listed diagnosis given by Dr. Mandich was COPD.   A copy of Dr. Mandich's report was provided to Dr. Scardino who nevertheless rendered his first FCA on September 10, 2007 in which he found that plaintiff was capable of performing medium-level work.   Plaintiff subsequently underwent spirometric testing at the direction of Dr. Carroll which produced findings that were compatible with COPD.   A copy of Dr. Carroll's report was then furnished to Dr. Scardino who issued a second FCA

31

on November 8, 2007 in which he this time found that plaintiff was only capable of light-level work. Notably, even with the spirometric test results in hand, Dr. Scardino imposed no environmental restrictions above and beyond those that he had noted at the time of his first FCA. (Tr. pp. 176, 160).

As the foregoing evidence demonstrates, COPD was not diagnosed until after plaintiff's insured status had expired and its significance in his diagnosis gradually increased with the passage of time.  See McLendon, 194 Fed. Appx. at 432.  The objective evidence points to the conclusion that plaintiff did not suffer from COPD between the onset date and the expiration of his insured status or, if he did, that it imposed no significant restrictions on his activities during that time period.  The ALJ thus did not err in relying on Dr. Scardino's first FCA rather than the second one.

In his third and final challenge to the Commissioner's decision, plaintiff argues that his condition satisfies the criteria of Section 12.05(C) of the Listing of Impairments and that his case should be remanded for further development of the evidence.  In support of this argument, plaintiff cites the IQ test results that were obtained by Dr. Fontenelle on June 15, 2009, approximately 1 month subsequent to the issuance of the ALJ's decision.  Plaintiff argues that he properly submitted Dr.

32

Fontenelle's report to the AC which failed and/or refused to consider the findings in declining to grant plaintiff's request for review.  By way of his motion to submit additional evidence, plaintiff asks that the Court consider school records that he obtained which indicate that he received failing marks in the first, second, and third grades. (Rec. doc. 11).  This evidence, plaintiff maintains, demonstrates that he had a low IQ prior to attaining the age of 23. (Id.).

Although plaintiff originally requested, in his cross-motion for summary judgment, that his case be remanded to the Commissioner to develop further evidence as to whether his condition satisfies the criteria of Listing 12.05(C), he now suggests that the school records that he attached to his motion to admit be considered by the Court without them having been first presented to the Commissioner. No authority is cited for this suggested course of action.  Under 42 U.S.C. §405(g), a court may remand a claimant's case back to the Commissioner to consider additional evidence "... upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; ..." For evidence to be material, there must be a reasonable possibility that it would have changed the outcome of the Commissioner's decision had it been considered and it must relate to the time period for which

33

benefits were denied.  <u>Latham v. Shalala</u>, 36 F.3d 482, 483 (5th Cir. 1994).  The evidence must also be new and not merely cumulative of what is already in the record.  <u>Id</u>.

Given the significant vintage of the school records in question, they cannot be thought of as new.  And absent some indication as to when the records first came to be sought the Court is unable to determine whether good cause exists for plaintiff's failure to obtain them sooner and to admit them in the administrative proceedings.  To the extent that plaintiff testified that he did not proceed past the third grade, the school records are also cumulative of what is already in the record.  Most importantly, and for the reasons that follow, the Court does not believe that the school records are material because there is no reasonable possibility that they would have changed the outcome of the Commissioner's decision.

Section 12.05(C) of the Listing of Impairments provides that an individual will be considered presumptively disabled if he suffers from:

> *Mental Retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

34

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;...

If the third step of the 5-step sequential analysis under §404.1520 is reached, it is the claimant who bears the burden of proving that his impairment or combination of impairments meets or equals a Listing. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999). "For a claimant to show that [his] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990).

In Randall v. Astrue, 570 F.3d 651 (5th Cir. 2009), the Fifth Circuit made it clear that "... every mental disorder listing includes two independent components: a diagnostic description of the disorder and specific criteria measuring the disorder's severity." Id. at p. 658 (footnote omitted). A claimant thus bears the initial burden of demonstrating that his impairment satisfies the diagnostic description of a particular Listing's introductory paragraph. Id. at p. 659. The diagnostic description for Listing 12.05 first requires an independent showing of "...significantly subaverage general intellectual functioning with

deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Id. at pp. 659-60.  If the claimant makes that independent showing and the inquiry proceeds to the severity criteria set forth in subsection "C" of Listing 12.05, the ALJ may make factual determinations on the validity of the IQ test scores that those sections require.  Muse v. Sullivan, 925 F.2d 785, 789-90 (5th Cir. 1991)(citing Pierre v. Sullivan, 884 F.2d 799, 803 (5th Cir. 1989)).  In Muse, for example, the ALJ discounted the claimant's full scale IQ score of 58 based, inter alia, on the fact that he had worked as a truck driver and had never been fired from a job because he could not comprehend, remember, or carry out the mental rigors of work.  Id. at pp. 789-90.

In addressing plaintiff's third challenge to the Commissioners's decision, the Court initially notes that contrary to his present assertions, the AC did in fact receive and consider Dr. Fontenelle's report as part of its review process. (Tr. pp. 6, 9). The Court further notes that plaintiff did not identify mental retardation as a basis for disability in his application for DIB, listing only a heart condition and resulting symptoms in the Disability Report that appears in the record.  Pierre v. Sullivan,

884 F.2d 799, 802 (5th Cir. 1989).[2]/ The Court also questions whether plaintiff underwent IQ testing not in attempt to seek treatment but through an attorney referral in connection with his disability appeal. <u>See</u> <u>Bullard v. Astrue</u>, 2009 WL 3101002 at *8 (S.D. Tex. Sept. 23, 1989). When plaintiff was interviewed by an Administration employee on June 6, 2007, there were no perceived difficulties with his understanding, coherency, concentration, talking, or answering questions. (Tr. pp. 87-96).

Plaintiff has never received medical treatment for any emotional or mental problems. While he may have obtained failing grades in school, his emotional symptoms were only characterized as moderately unsatisfactory and the Court cannot help but notice the excessive number of times that he was absent from school. It thus cannot be said, with any degree of certainty, whether plaintiff received failing grades due to a learning deficit as opposed to simply being absent. Most importantly, plaintiff's activities after reaching the age of 22 do not evidence mental retardation as he had participated in the work force for almost all of his adult life. <u>Caradine v. Astrue</u>, 2009 WL 3679771 at *4 (N.D. Miss. Nov.

---

[2]/ If plaintiff <u>had</u> identified mental retardation as a disabling condition in his application for Social Security benefits and accompanying paperwork, a medical or psychological expert would have been called upon to review plaintiff's file and make an assessment of plaintiff's mental functional limitations. <u>See</u> C.F.R §404.1520a(e)(1).

10, 2009)(citing <u>Muse</u>, 925 F.2d at 789-90); <u>Bullard</u>, 2009 WL 3101002 at *8. <u>See also Vaughan v. Shalala</u>, 58 F.3d 129, 131 (5th Cir. 1995); <u>Fraga</u>, 810 F.2d 1305 n. 11 (ability to work despite condition supports finding of "not disabled"). Simply put, plaintiff has not carried his burden of proving the diagnostic criteria of Listing 12.05(C) by demonstrating: 1) significantly subaverage general intellectual functioning and 2) deficits in adaptive behavior, 3) which manifested themselves before the age of 22. <u>Caradine</u>, 2009 WL 3769771 at *4.

## **RECOMMENDATION**

For the forgoing reasons, it is recommended that plaintiff's motion for summary judgement be denied and that defendant's motion for summary judgement be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this 22nd day of _____March_____,
2011.

_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE